NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————————
:
LAILA ELMIRY,                                    :
                                                 :          Civil Action No. 04-3621 (PGS)
            Plaintiff,                           :
                                                 :
     v.                                          :
                                                 :
**WACHOVIA CORPORATION,**                        :
**WACHOVIA BANK; WACHOVIA**                      :          **OPINION**
**SECURITIES, LLC, WACHOVIA**                    :
**SECURITIES FINANCIAL**                         :
**NETWORK, LLC, DIANE VAGILE and** :
**RONALD CACHOEIRA,**                            :
                                                 :
            Defendants.                          :
———————————————————————:

**SHERIDAN,  U.S.D.J.**

Plaintiff Laila Elmiry (hereinafter "plaintiff") filed a Complaint in the Superior Court of New

Jersey, on November 15, 2004, against Wachovia Corporation, Wachovia Bank, Wachovia

Securities, LLC, and Wachovia Securities Financial Network, LLC (collectively referred to as

"defendants"), claiming discrimination, creation of a hostile work environment, and intentional

infliction of emotional distress.  Defendants removed the matter to this Court on December 22, 2004.

An Amended Complaint was filed on October 12, 2005 clarifying allegations of discrimination based

on national origin, ethnicity, religion, age, and gender creating a hostile work environment in

violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq.

Plaintiff abandoned her claims for breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress[1].

***Facts:***

Plaintiff Elmiry, a Coptic Christian woman of Egyptian descent, 46 years old at the time of the filing of the Complaint, moved to the United States in January 1978 and became a United States citizen approximately three years later. Dating back as far as 1992, plaintiff was employed by Wachovia Bank and Wachovia Securities, starting as a part-time teller. In 1999, plaintiff began working at the Airedale, New Jersey branch as a Customer Relations Manager ("CRM").

Ronald Cachoeira ("Cachoeira"), 45 years old, hired in May 1999 as a Financial Specialist Leader ("FSL"), oversaw the sales performances and customer service provisions of Financial Specialists ("FS"). In 2000, Cachoeira promoted plaintiff to an FS. From 2000 to 2003, plaintiff

---

[1] Defendants maintain that neither Diane Vasile nor Ronald Coccaro, individual defendants, were ever served with the Amended Complaint. Plaintiff, however, argues that "[a]ll parties have abided by the United States District Court's Electronic Case Filing Policies and Procedures as Amended October 1, 2006 by submitting the Filing User Registration Form to the court, and thus have given their 'consent to service of all papers via the court's electronic filing system as provided in Federal Rules of Civil Procedure 5(b) and 77(d).'" However, Paragraph 16(a) of the Electronic Case Filing Policies and Procedures, entitled "Service of Documents by Electronic Means," provides that "[n]othing in these procedures shall affect the manner of filing and service of complaints...and the issuance and service of summonses, which in all civil actions shall continue to be filed, issued and served in paper form and in conformance with the Federal Rules of Civil Procedure and the Local Rules of this Court." Thus, plaintiff is still required to serve any added parties in accordance with Fed. R. Civ. P. 4. Defendants advised plaintiff that they would not accept service on behalf of the individual defendants and at no time ever advised plaintiff that it would be representing the individual defendants. Plaintiff has failed to serve Defendants Diane Vasile and Ronald Coccaro, and because the time to serve these defendants pursuant to Fed. R. Civ. P. 4(m) has expired, the claims asserted against these defendants should be dismissed without prejudice. The Court notes that defendants' argument concerning the statute of limitations as to these defendants was only brought up in defendants' reply to which plaintiff did not have an opportunity to respond. Therefore, the Court does not address this issue and dismisses these parties without prejudice.

reported directly to Cachoeira.  As a FS, plaintiff was responsible for selling bank and investment products.  Plaintiff held a Series 6 and 63 license as well as a license to sell insurance.  The Series 6 and 63 licenses are regulated by the National Association of Securities Dealers (NASD) and the Securities Exchange Commission (SEC) and allowed plaintiff to sell restricted investments, but not stocks.  As her supervisor, Cachoeira received a salary plus a bonus based on how the FS that reported to him performed.  Plaintiff understood that it was in Cachoeira's best interest for his FS to succeed.  In 2001, Cachoeira promoted plaintiff to Senior FS.

On October 1, 2001, plaintiff was given an initial warning for misconduct.  According to the plaintiff, Cachoeira gave plaintiff an initial warning because he believed that she closed an account and then re-opened it in order to receive the credit for the sale.  Plaintiff disagrees with Cachoeira's description of events and claims that another FS closed the customer's account and opened a new account.  According to the plaintiff, the customer complained to her and she closed the new account and opened another new one.

Despite this warning, plaintiff received an overall rating of "Exceeds Expectations" for the 2001 calendar year.  In his review, Cachoeira noted the following: "Overall, Laila is a very strong contributor.  She is a go getter, bright, dedicated, competitive and serves her clients very well.  She has leveraged her community ties in Airedale very effectively and she presents First Union/Wachovia in a very positive light.  I personally enjoy working with her and I look forward to Laila's continued success and future development in her Sr. FS position."

The employees at the Airedale Financial Center consisted of two FSs, a Financial Advisor ("FA"), the Customer Relations Manager ("CRM"), and tellers.  Plaintiff was the only FS at the Airedale Financial Center before Don Carbone ("Carbone") was hired as a FS for the Airedale

Financial Center in or about May or June 2002.  In 2001, Defendant Diane Vagile, who is currently 43 years old, was the CRM, and Eric Kohlmeir ("Kohlmeir") was the FA.  According to the plaintiff, an FA monitors an FS on investment sales, and the CRM overlooks the branch.  Vagile did not report to Cachoeira.  Vagile did not evaluate plaintiff's performance and had no input into her performance review.  According to the defendants, Vagile had no authority to reprimand or discipline plaintiff.  Plaintiff disputes this statement's validity, maintaining that Vagile had the authority to give job assignments and issue directives.

Following the events of September 11, 2001, plaintiff claims that Vagile began making discriminatory remarks, including telling her to go back to her home country and that "President Bush wants her to go back."  Plaintiff states that Vagile would comment about the way plaintiff dressed, would mock plaintiff's accent, and make outlandish statements like "all of you Arabs are the same, you come here, take our money and then bomb us."  According to plaintiff, "no week passed by without [] hearing all of those comments."  Plaintiff also testified that Vagile continually told plaintiff that she was not part of the Italian team and that she was ruining the "Italian flavor" at the branch.  Plaintiff complained to Cachoeira about Vagile at plaintiff's annual review, but plaintiff claims that no action was taken and no investigation was performed.

In addition to the aforementioned comments, plaintiff testified that Cachoeira, Vagile, and Carbone made inappropriate statements regarding her sex.  Plaintiff alleges that Cachoeira "kept telling me, you're a woman, you're making enough money for a woman, why don't you leave it for a man, the man needs a car, the man needs the money. You have a husband that works and makes a good amount of money."  Plaintiff alleges that Cachoeira also told her that she should "sign over" some of her sales and clients to Carbone, her male co-worker, because Carbone "supports a family

4

and needs the money more than you do."  Plaintiff claims that Vagile and Carbone made similar comments regarding her sex.[2]

On August 22, 2002, Cachoeira met with plaintiff to discuss some issues and customer complaints.  Among the issues discussed at the meeting were: (1)  A customer complained that plaintiff made promises she could not deliver; (2) plaintiff credited a new account with $5,000 instead of $50; and (3) plaintiff ordered checks for a customer with a different customer's information.  Plaintiff threatened to resign at the meeting because, according to defendants, plaintiff claimed that she "had it."  According to the plaintiff, she discussed resignation because "she did not believe it was worth it to go through discrimination."

On August 30, 2002, plaintiff received a written warning from Cachoeira based on incidents that occurred in July and August.  The warning stated that on July 31, 2002, plaintiff yelled at Carbone and told him to stay away from her clients after Carbone performed a transaction for one of plaintiff's customers when plaintiff was out of the office.  In addition, the warning stated that on or about August 1, 2002, after Vagile reviewed a CD maturity list and assigned certain customers to plaintiff and Carbone pursuant to policy, plaintiff objected, telling Vagile that she was not her manager and had no authority to assign her accounts and, later that day, allegedly yelled an insult at Vagile in front of employees and customers.  The last incident contained in the warning occurred on August 16, 2002, concerning an argument between the plaintiff and Carbone regarding SOLD

---

[2]  Plaintiff's factual support for her claim regarding age discrimination stems from a comment by Coccaro who alleged stated, "you're getting old."  However, the statement was apparently made in response to plaintiff's own statement that she was old and could not leave the financial center to solicit business.

5

procedures.[3]  Defendants claim that Cachoeira noted that plaintiff "deliberately disregarded the financial center's working agreement by ignoring SOLD notes and the Top 100 Client Portfolio process."  Plaintiff denies the occurrence of each of these three incidents.  Following these alleged incidents, plaintiff was placed on written warning for 90 days.

Plaintiff refused to sign the warning, believing it to be in retaliation for previous complaints made against Vagile and Carbone.  When plaintiff informed Cachoeira that she intended to contact Donna Dieterle ("Dieterle"), the Regional Manager and Cachoeira's supervisor, plaintiff maintains that Cachoeira stated, "you better not or else you are going to see what happens to you . . . you are going to pay for it."

Plaintiff contacted Rosa Lopez ("Lopez"), a Human Resources Advisor, to make several work-related complaints.  According to Lopez's hotline notes, plaintiff complained that she felt that Vagile had discriminated against her.  Plaintiff told Lopez that Vagile commented on the "Italian team" and highlighted that plaintiff was not Italian.  In addition, plaintiff complained that Vagile commented on her accent.  Plaintiff also stated that Carbone threatened her by telling her that she was a "small fish in a big sea and that he could crush her any time."  Plaintiff further alleges that she approached Cachoeira for assistance and he responded that she should not contact Dieterle, because it would "make matters worse."

---

[3]  The SOLD note system is the software for prospecting efforts for FSs.  At Wachovia, no FS "owns" a particular customer.  If an FS is prospecting for a customer, they put a note in the system called a "SOLD note."  The FS then has a certain amount of time to sell that customer the product.  If the customer goes to another Financial Center within that period of time, the FS there would see the "SOLD note" and if a sale were completed for the customer, the original FS would receive credit for that sale.

Thereafter, plaintiff met with Dieterle regarding the alleged discrimination in the workplace and comments made by Vagile.  After advising Lopez of her conversation with Dieterle, Lopez stated that plaintiff should call her if anything further occurred.  Plaintiff did not contact Lopez again.

On September 23, 2002, plaintiff met with John Compton ("Compton"), Regional Sales Manager, and Christine Collura, Compliance Officer, to discuss plaintiff's trades and a recent customer complaint.  Specifically, plaintiff had a customer sign the wrong form.  Plaintiff testified that she believed that this incident was a "trap" by Compton and others at Wachovia, but insists the matter occurred by accident and that forms merely "got stuck" together.  Defendants also alleged that plaintiff improperly advised a customer regarding a stock.  Plaintiff disputes this alleged fact and claims that she informed the customer that she could not provide advice on stocks and attempted to assist the customer by emailing the FA, Eric Kohlmeir, for assistance.

As a result of the alleged incidents, plaintiff was placed on "heightened supervision." Plaintiff was advised in writing that failure to abide by the heightened supervision process could result in corrective actions including termination.

Nevertheless, for the 2002 year review, dated February 21, 2003, plaintiff received a "Meets Expectations" overall rating.  Cachoeira noted that plaintiff needed to focus on compliance issues as well as team dynamics.

In May 2003, Michael Cuttita ("Cuttita") replaced Kohlmeir as the FA at the Airedale Financial Center.  Cuttita was not involved in evaluating plaintiff's performance and had no authority to hire or fire employees or recommend any such action.

On June 18, 2003, plaintiff and Cuttita sold a mutual fund to a customer.  The sale involved Evergreen Managed Income Fund, which plaintiff was not licensed to sell.  Cuttita testified that he checked the computer system to see if the customer had a brokerage application on file and assumed he did because there was an entry of "BRK," which means brokerage account application.  It would later become known that this assumption was incorrect, as the account Cuttita viewed was a custodial account, as opposed to a brokerage account, and thus contained no valid brokerage account application.  Nevertheless, Cuttita then sold the customer an income fund, which is a transaction that only an FA could make.

On June 26, 2003, plaintiff sold this same customer an annuity.  At this time, a valid brokerage account application for the customer was still not on file.  On June 28, 2003, Cuttita performed another trade for the customer, but the account was restricted because of the fact that there was no brokerage account application on file.  On July 29, 2003, Cuttita received an e-mail from the operations department notifying him that the customer's account was restricted.

Following the e-mail, Cuttita approached plaintiff and explained that they needed a signed application from the customer so that their commissions would not be reversed.  Plaintiff disputes the accuracy of this event and alleges that Cuttita stated the original document had either been lost or misplaced.  Defendants then allege that following Cuttita's request, plaintiff completed the application for the customer, including the signature block, and gave Cuttita a copy of what appeared to be the completed and signed application.  Plaintiff denies this allegation and claims that she "printed" the customer's name below the signature line, and handed the form to Cuttita because he told plaintiff he would take care of getting the customer's signature.

After plaintiff handed Cuttita a copy of the application, Cuttita asked Vagile, whose desk is in the front of the bank, if she had seen the customer enter the bank.  Vagile responded that no one entered the bank, as the bank was closed.  Cuttita then called his superior, Compton, to inform him that the plaintiff had signed a customer's name to a brokerage account application.  According to defendants, the plaintiff placed the completed application into an interoffice envelope and forwarded it to operations for processing.  Plaintiff denies placing the application in an interoffice envelope and maintains that she handed Cuttita the application for him to complete.  On the evening of July 29, 2003, Cuttita called the customer and went to his house to have him sign the brokerage account application.  Defendants claim that Cuttita asked the customer to sign the brokerage account application because they needed to have it in the file.[4]

On August 18, 2003, Laura Sisto ("Sisto"), Senior Fraud Investigator, spoke with plaintiff regarding the July 29, 2003 incident.  Sisto asked plaintiff a series of questions and plaintiff documented her responses.  Defendants allege that plaintiff acknowledged that she could terminate the interview at any time.  Plaintiff disputes this fact and states that she requested the meeting be adjourned because she felt ill.  Nevertheless, the interview proceeded during which defendants claim plaintiff admitted that she "printed" the customer's name on the signature line without the customer's knowledge.  Plaintiff further admitted that she sent the July 29, 2003 application to the operations department.  In addition, plaintiff responded that she was aware that she violated SEC regulations.  After the interview, plaintiff initialed her responses and did not ask to change them.

---

[4]  Plaintiff disputes this fact and claims that defendants' response to the EEOC complaint stated that Cuttita went to the customer's house and showed him the forged application at which time the customer confirmed that the signature was not his.  Defendants claim that Cuttita did not ask the customer to verify his signature until about a month thereafter.

Subsequently, Cocarro informed plaintiff that based on her responses, her employment had to be terminated. Following her termination, plaintiff called Human Resources and asked to provide additional comments to her statement. Human Resources permitted this request. Plaintiff then drafted a two-page statement that she attached to her original interview.

At her deposition, plaintiff again admitted that she completed every section of the brokerage account application, including the name in the block for "applicant signature." However, plaintiff claims that she did not sign the customer's name within the signature block; rather she printed the customer's name within the block.[5] In addition, plaintiff testified at her deposition that she handed the completed application to Cuttita and did not place it in an interoffice envelope. Plaintiff suspects that Cuttita did this because he was setting a "trap" for her so that she would be terminated and he could take her clients. However, plaintiff did not provide any such explanation during her August 18, 2003 interview with Sisto.

**_Discussion:_**

Plaintiff filed a Complaint in the Superior Court of New Jersey which defendants removed to the United States District Court for the District of New Jersey. In her Amended Complaint filed after removal, plaintiff charged defendants with discrimination, hostile work environment, and

---

[5] The Court requested and Wachovia submitted documents that show that Plaintiff received training on many aspects of handling financial transactions. Wachovia submitted various training manuals, a Wachovia code of conduct, and a Human Resources list of training sessions completed by Plaintiff (which indicates Plaintiff received training on mutual funds sales and regulatory, compliance, and sales standards). Plaintiff now contends she never received the manuals or the code of conduct, and challenges the particular training sessions listed, asking to see sign-in sheets and certifications for training and materials specific to filling out brokerage applications. Suffice it to say, the Plaintiff received extensive general training in many aspects of financial transactions, and whether she attended particular training sessions or received particular documents is not germane to the outcome of the case.

retaliation based on plaintiff's national origin, ethnicity, religion, age, and gender pursuant to the

New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*,[6] and  Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § § 2000e *et seq.*

## I.  Discrimination

Discrimination claims brought under Title VII and NJLAD must be analyzed according to

the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *See also Schurr v.*

*Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to

the NJLAD generally follows analysis of a Title VII claim.").  The framework consists of three steps.

First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination.

*Hicks*, 509 U.S. at 506.  To establish such a prima facie case, the plaintiff must show that (1) she is

a member of a protected class; (2) she is qualified for the position in question; (3) she suffered from

an adverse employment decision; and (4) the employer sought to or did fill the position with a

similarly qualified person who was not a member of the protected class.  *McDonnell Douglas*, 411

U.S. at 802.

---

[6] Title VII does not cover claims of discrimination based on age, *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466 n. 4 (1982), and plaintiff does not bring a claim under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*  Accordingly, the Court evaluates her age discrimination claim only under the NJLAD.  The Court, nevertheless, applies the *McDonnell Douglas* framework, as addressed in greater detail below, because, as the Supreme Court of New Jersey has observed, New Jersey courts have "frequently looked to case law under Title VII ... for guidance in developing standards to govern the resolution of [NJ]LAD claims."  *Carmona v. Resorts Int'l Hotel, Inc.*, 915 A.2d 518, 528 (N.J. 2007). *See also Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) (adopting the *McDonnell Douglas* burden-shifting framework to evaluate an age discrimination claim).

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802.

If the defendant satisfies this burden, the reviewing court must proceed to the third step.  At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendants' articulated, nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253.

A plaintiff will satisfy this burden by providing evidence that would cause a fact finder to disbelieve the reasoning articulated by the defendants or believe that invidious discriminatory reasons were more likely than not a motiving cause of the defendants' actions. *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994).  Although the evidentiary burdens shift between the plaintiff and the defendants, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Defendants allege that they are entitled to summary judgment on plaintiff's discrimination claims because she fails to demonstrate a prima facie case of discrimination and, if the Court were to reach defendants' legitimate, nondiscriminatory reason for its actions, plaintiff has failed to point to any genuine issue of material fact that defendants' reason was pretext for discrimination.  Plaintiff alleges that she was fired by defendants because of her national origin, ethnicity, religion, age, and/or gender in violation of Title VII and the NJLAD.

While defendants concede most of the elements of the prima facie case of discrimination, defendants maintain that plaintiff fails to establish the second prong of test (she is qualified for the

position in question) which, according to defendants, requires that the plaintiff be performing her job at a level that met her employer's legitimate expectations. See *Zine v. Stanley Roberts, Inc.*, 867 A.2d 1133 (N.J. 2005). However, this language is applicable only to the NJLAD, as opposed to Title VII. As specifically noted in *Zine*, "[o]f the forty-one jurisdictions (forty states and the District of Columbia) with case law on the subject, only eight (including New Jersey) have adopted the 'employer's legitimate expectations' standard." *Id.* at 1141. In analyzing the requirement further, the court noted that *Viscik v. Fowler Equip. Co.*, 800 A.2d 826, 832 (N.J. 2002), considered the issue and held that the "employer's legitimate expectations" is an objective and not a subjective standard and, in accord with a vast majority of sister jurisdictions, reserved the issue of the employer's subjective expectations for the pretext stage. *Viscik*, 800 A.2d at 837-38. The court in *Zine* made clear that "[a]ll that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination." *Zine*, 867 A.2d at 1143. In this case, although plaintiff received warnings and reprimands and allegedly signed the name of a customer on a brokerage account application in violation of SEC regulations, the evidence also shows that plaintiff's performance, as stated in her annual reviews, was either "exceeding expectations" or "meeting expectations." Therefore, the plaintiff has established a prima facie case of discrimination.

The Court next examines the defendants' legitimate, nondiscriminatory reason for terminating plaintiff. The defendants' burden in this regard is "relatively light." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994)). Defendants clearly and unequivocally state that plaintiff was terminated after an investigation during which plaintiff admitted that (1) she "printed" the customer's name in the block for "applicant's signature" on a brokerage application; (2) the customer did not know that she "printed" his name in

the "applicant signature" block; (3) she sent the application to operations to be processed; (4) she did not have the customer come to the bank to sign his name; (5) the bank did not have a valid brokerage account application on file for the customer; (6) without a valid brokerage account application the bank was in violation of SEC regulations; (7) she was aware of the SEC regulations; and (8) she was aware she violated the SEC regulations and jeopardized the bank's license by not having the customer sign the agreement.  Finding defendants' showing sufficient, the burden then shifts back to the plaintiff to demonstrate pretext.

To succeed on this element of the burden shifting test, plaintiff must now point to evidence from which a reasonable fact finder could conclude either: (1) that the employer's articulated legitimate reasons are unworthy of belief (i.e. pretextual), or (2) that unlawful discrimination "was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764; *Sheridan v. E.I. Dupont de Nemours and Co.*, 100 F.3d 1061 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997).  To disprove the employer's proffered reason, the question is not whether the action was prudent, but:

> the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incohererencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them "unworthy of credence"... and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons"....

*Fuentes*, 32 F.3d at 765 (citations omitted).  The evidence may be either direct or circumstantial and plaintiff is not required to adduce evidence contradicting the specific reasons proffered by the defendants. *Antol v. Perry*, 82 F.3d 1291, 1300 (3d Cir. 1996).

Plaintiff contends that there are "many inconsistencies, contradictions, and implausibilities in defendants' version of what and how the events transpired, and who should have been held accountable for the errors made with regard to the defendants' proffered reasons for its actions, that a reasonable factfinder could rationally find them unworthy of belief . . .." Plaintiff maintains that defendants have not provided the "whole story." Plaintiff first points out that she was on "heightened supervision" and, therefore, her work, including the June 18, 2003 transaction, should have been reviewed by Cuttita, who failed to do so. It is then argued that a question of fact exists as to who sold the first security to the customer. Plaintiff claims that if there was no brokerage application on file or it was out of date, a new application was supposed to have been filled out by the person who met with the customer and sold the security (Cuttita, according to plaintiff). However, these arguments are unconvincing. The fact remains, whether it was plaintiff's obligation to do so or not, plaintiff filled out the brokerage account application and "printed" the customer's name on the application without the customer's knowledge or consent.

Plaintiff next argues that defendants' investigation was flawed. According to plaintiff, defendants failed to interview Cuttita, "the eyewitness and other party to the transaction," and "decided not to meet with Elmiry to get her version of events, except in the form of a more formal 'witch hunt.'" The Court finds no fault in the investigation conducted by defendants. In spite of plaintiff's claims to the contrary, she was afforded an opportunity to provide her version of the events when questioned by Laura Sisto, the Senior Fraud Investigator. Moreover, when plaintiff requested an opportunity to supplement her responses, defendants permitted plaintiff to do so, and she attached her supplemental statement to the investigation interview. The plaintiff's claims of a

15

"witch hunt" are completely unfounded, particularly since plaintiff has claimed no discrimination on the part of either Sisto or Cuttita.

Plaintiff claims that she has consistently offered one version of the events. However, this is not the case. While plaintiff may have consistently maintained one story since plaintiff testified before the NASD on January 22, 2004, the series of events set forth in plaintiff's opposition to the motion for summary judgment is not in line with the admissions made to Sisto immediately following the incident. Now, plaintiff argues that Cuttita told plaintiff to "hand write the application and print the customer's name" and that "Cuttita would take care of the rest." Plaintiff maintains, on this motion, that she did not question the directive of her supervisor because she was "already being scrutinized at work." However, this version of events does not correspond with the statements made in the interview with Sisto. In the interview the following question-and-answer exchange took place:

> Q.   Describe what you know about the incident being investigated.
> A.   The brokerage application. I printed the name and the line says the signature.
> Q.   You printed the signature/name of the customer on the brokerage application?
> A.   Yes.
> ****
> Q.   [The customer] does not know that you signed the application?
> A.   No, he doesn't know that I printed his name.
> ****
> Q.   Why didn't you have the customer sign the application that you submitted?
> A.   I thought I was copying the info. on the system. What I should have done is bringing [sic] the customer in and make a new application and make [sic] his signature.
> ****

16

> Q.    If we do not have a valid application then the Bank is in violation of SEC compliance, is that true?
> A.    Yes.
> Q.    You are a licensed employee and you are aware of these regulations?
> A.    Yes.
> Q.    So you are aware that you violated those regulations and jeopardized the bank's License by not having the customer sign the agreement.
> A.    Yes.
> ****
> Q.    Are you giving this statement of your own free will without fear, threats or promises?
> A.    Yes.

Plaintiff claims that she was "never asked why she allegedly 'signed' the application. However, it is clear from the above exchange that she was asked "Why didn't you have the customer sign the application that you submitted?"  In response to this question, plaintiff did not claim that she was directed to "print" the customer's name by a supervisor.  Moreover, the interview's final question asked whether plaintiff wished to make any additional statements.  Plaintiff did not offer the information proffered here.  Further, when afforded an opportunity to supplement her answers, plaintiff again failed to even suggest that she was merely following orders.

Plaintiff also argues that she was feeling ill, unable to concentrate, and despite repeated requests for a break, was denied same.  However, plaintiff signed the document evidencing the interview, which began with the following introduction:

> I, Laila Elmiry, hereby make the following statement of my own free will without force, fear, threat or promise of reward or leniency.  I have been informed by Laura Sisto of Corporate Fraud Investigative Services of the reason for this interview.  I can read, write and understand the English language.  I understand I can terminate this interview at any time.

17

Additionally, plaintiff answered in the affirmative when she was asked whether she was "giving this statement of your own free will without fear, threats or promises."

At the outset, the Court notes that the relevant inquiry regarding pretext is not whether defendants' decision to terminate plaintiff was wrong or a mistake, but rather, whether defendants acted with discriminatory animus. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001) (citing *Fuentes*, 32 F. 3d at 765, *supra*); *Wheeler v. Aventis Pharmaceuticals*, 360 F.3d 853, 859 (8th Cir. 2004) (citation omitted); *see also Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (citation omitted) (holding the employer's reason for discharging plaintiff, which was based on an allegedly imprudent, ill-informed, and inaccurate investigation of disability fraud, if honestly described, would not establish pretext); *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1231-32 (10th Cir. 2000) (holding that where employer, after an investigation, made its disciplinary decision based on its belief that plaintiff committed the alleged acts, evidence that plaintiff did not actually commit the misconduct was not sufficient to show pretext); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.") (citation omitted).

The analysis of the pretext inquiry in *Kariotis* is particularly instructive.  In that case, the Eighth Circuit held that the employer's reason for discharging plaintiff -- which was based on an allegedly imprudent, ill-informed, and inaccurate investigation of disability fraud -- if honestly described, would not establish pretext. *Kariotis*, 131 F.3d at 677.  The court of appeals further opined that plaintiff's attack on the employer's decisional process was misspent unless she was able to adduce evidence suggesting that the employer investigated her differently because she was on

18

disability leave.  *Id.*  In that case, plaintiff failed to produce any evidence that her employer approached her case differently from others.  *Id.*  The court of appeals concluded, therefore, that plaintiff had not established that the employer's proffered reason for termination was based on illegal discrimination.[7]

In the instant case, plaintiff does not offer any argument or evidence of alleged weaknesses, implausibilities, and inconsistencies that would cast doubt on defendants' proffered reasons for plaintiff's termination, other than to challenge defendants' conclusion regarding their underlying investigation of the allegedly forged application.  Plaintiff's focus on the underlying investigation is misplaced for two reasons.  First, defendants' investigation of the SEC violation was based on a valid business judgment and therefore the Court is not permitted to review the logic behind defendants' business decisions.  *Wheeler*, 360 F.3d at 859 (citation omitted); *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988) ("Barring any attempt to hide discrimination, [a company] has the right to make business judgments on employee status, particularly when the decision involves subjective factors . . . the Company deems essential" to certain positions.); s*ee also Geddis v. Univ. of Del.*, 40 Fed. Appx. 650, 653, (3d Cir. 2002) (allegations of inadequate investigation not sufficient to show employer acted with discriminatory animus).  Second, plaintiff's focus on the underlying investigation is merely a distraction; evidence that she did not actually commit the misconduct or that the investigation was somehow deficient is not sufficient to show pretext, and she has also failed to produce any evidence that defendants approached the complaints against her differently from any similar complaints lodged against employees outside of her protected group(s). *Billet*, 940 F.2d at

---

[7]  Although plaintiff maintains that Cuttita was never investigated or disciplined for failing to review plaintiff's work while she was on "heightened supervision," the difference in the severity of the infractions at issue render such a comparison irrelevant.

825; *Kendrick*, 220 F.3d at 1231-32; *Kariotis*, 131 F.3d at 677. The record is devoid of any evidence suggesting that defendants approached this violation differently because of the ethnicity, national origin, gender, religion, or age of the employee.  Enforcement of securities law is driven by regulating persons who sell such financial instruments. Such persons are licensed based on knowledge and character.  Violations of regulations must result in harsh penalties in order to protect the public from unscrupulous practice. Here the record shows Wachovia was, by internal review, making certain that securities regulations were being properly complied with. Having found that they were not, Wachovia fired plaintiff.

## II.  Retaliation

Plaintiff also makes a claim that she was subjected to retaliation in response to the grievances aired regarding discrimination to Cachoeira, and subsequently to Cachoeira's supervisor, Donna Dieterle.  According to plaintiff, when advised that she intended on speaking to Dieterle, Cachoeira stated, "you better not or else you are going to see what happens to you . . . you are going to pay for it."

The burden-shifting requirements of *McDonnell Douglas* similarly apply to retaliation cases. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).  Therefore, plaintiff must show that (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the employee's protected activity and the employee's adverse action.  *Schellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003).  If plaintiff is able to establish these elements of her prima facie case, the burden then shifts to defendants to advance a legitimate, non-retaliatory reason for its adverse employment action.  *Id.*  If defendants satisfy that burden, then plaintiff must

prove that "retaliatory aminus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Id.* As with plaintiff's discrimination claim above, the same analysis applies for plaintiff's claims under state and federal law. *Schurr*, 196 F.3d at 498.

Defendants readily admit that plaintiff's complaint to Human Resources in 2002 involving allegations of harassment and discrimination constitute a protected employee activity. Similarly, it is undisputed that after such activity, plaintiff was terminated, which clearly rises to the level of adverse employment action. Defendants, however, argue that there is no causal link between the two and, thus, plaintiff cannot prove a prima facie case.

First, defendants note that neither Vagile nor Carbone were involved in the events leading to plaintiff's termination. Cuttita, who was involved, was not employed by defendants when the harassment and discrimination complaints were made. However, the Court finds that the retaliation centers around Cachoeira, who threatened plaintiff not to make any complaint to his supervisor and who ultimately terminated her employment based on her responses to Sisto's questioning.

Defendants also point out that plaintiff's termination was a year after she complained to Human Resources. Temporal proximity that is "unduly suggestive" satisfies the causation element of a plaintiff's prima facie case at the summary judgment stage. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000)); *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) ("Even if timing alone could ever be sufficient to establish a causal link, ... the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.") (internal citations omitted). Using time to satisfy the causation element of the prima facie case, however, requires consideration "with a careful eye to the specific facts and

circumstances encountered." *Farrell*, 206 F.3d at 279 (citing *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997)). "There is clearly a difference between two days and nineteen months." *Id.*; *see Morrison v. Carpenter Tech. Group*, 193 Fed. Appx. 148, 155 (3d Cir. 2006) (holding four month span between protected activity and adverse action "not sufficiently close to be 'unduly suggestive'" of retaliation); *see also Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (holding that two months was not "unduly suggestive"); *Thomas*, 351 F.3d at 115 (3d Cir. 2003) (temporal proximity of three weeks between complaint and termination letter was not considered to be unduly suggestive).

The Court in *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) found that "[w]hen temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."   If the timing of the events is not "unduly suggestive," the plaintiff can still show a causal link with other circumstantial evidence, such as evidence of ongoing antagonism or inconsistent reasons for terminating the employee. *Farrell*, 206 F.3d at 280-81 (citing cases).

Here, plaintiff offers no showing of temporal proximity, as the one year between the protected activity and the adverse employment action is clearly not unduly suggestive.  Plaintiff's causal connection, however, is with Cachoeira, who stated, "you better not [contact Dieterle] or else you are going to see what happens to you . . . you are going to pay for it."  Although the Court is aware of the one year separation between this threat and the adverse employment action, such a threat, as opposed to mere evidence of temporal proximity, is actual evidence of retaliatory motive. *See Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869-70 (9th Cir. 1996).  In *Strothers*, plaintiff's supervisor advised plaintiff "that he knew that she had contacted the EEO people up north

and that it would not be in her best interests to file a discrimination charge."  The Ninth Circuit found that "[t]hese alleged threats could be considered actual evidence of the [defendant's] discriminatory motive, which alone would be sufficient to establish a prima facie case." *Id.* at 870, n.13 (citing *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985)); *see also Jones v. Coughlin*, 45 F.3d 677, 679-80 (2d Cir. 1995) (dismissal on pleadings inappropriate in light of testimony regarding retaliatory threats and evidence of sequence of retaliatory events).

Given actual evidence of retaliatory motive, the Court finds a sufficient causal connection so as to establish a prima facie case of retaliation.  Therefore, the burden of production shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).  Finding that defendants have carried the burden of production, the plaintiff may prove, by a preponderance of the evidence, that the defendants' articulated reason (allegedly forging a brokerage application) was not the actual reason, but rather a pretext for unlawful retaliation. *See Burdine*, 450 U.S. at 256; *see also Williams*, 380 F.3d at 759 n. 3.  Where, as here, a plaintiff attempts to prove pretext by indirect evidence, she may meet this burden by offering evidence that the defendants' reasons are not worthy of credence or that a retaliatory motive was more likely than not a "determinative factor" in (or "but-for" cause of) her employer's decisions. *See Watson v. SEPTA*, 207 F.3d 207, 215, 222 (3d Cir. 2000); *see also Meyer v. Nicholson*, 441 F. Supp. 2d 735, 746 (W.D. Pa. 2006) (applying the "determinative factor" test to a retaliation claim).

Thus, the question becomes whether plaintiff would have been terminated following her interview with Sisto had she not contacted Cachoeira's supervisor regarding her complaints of harassment and discrimination.  Apart from Cachoeira's alleged threat, made a year prior to

23

plaintiff's termination, no evidence is offered to suggest that the action was done in retaliation for contacting Dieterle.  No conduct of Cachoeira in the interim suggests any animus.  In fact, plaintiff got a positive annual review, receiving a "Meets Expectations" overall rating subsequent to the incident.  Additionally, following her contact with Dieterle, plaintiff was disciplined for certain company infractions on a least one occasion, and, as a result of the alleged incidents, was placed on "heightened supervision" as opposed to being terminated.  Thus, the seriousness of the later infraction, investigated by Sisto and admitted by plaintiff, was clearly the cause for termination.  Plaintiff has failed to demonstrate that defendants' legitimate, nondiscriminatory reason for the adverse employment action was pretext for retaliation.

## III.  Hostile Work Environment

In order to establish a hostile work environment claim, a plaintiff must show that the harassment was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).  The Supreme Court has made clear that Title VII is not a "general civility code," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and has also instructed:

> Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Hence, [a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Clark County Sch. Dist. v. Breeden*, 524 U.S. 775, 270-71 (2001) (internal quotations and citations omitted).

Title VII and the NJLAD "do[] not mandate a happy workplace," *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006); rather, a hostile work environment claim requires discrimination based on a protected characteristic that is "severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990), *superseded by statute on other grounds*, 42 U.S.C. §§ 1981, 2000e et seq. (1991). In order to establish a hostile work environment claim, plaintiff must establish the existence of five elements: "(1) she suffered intentional discrimination because of her [ethnicity, national original, religion, age, and/or sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *Jensen*, 435 F.3d at 449 (emphasis added). In determining whether the facts alleged constitute a hostile work environment, the New Jersey Supreme Court has held that each incident should not be considered in isolation. *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 607 (1993). Rather, "courts must consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode had its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'" *Id.* (quoting *Burns v. McGregor Elec. Indus.*, 955 F.2d 559, 564 (8th Cir. 1992); *Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1524 (M.D. Fla. 1991)) (internal quotation marks omitted).

Under the second prong, plaintiff must demonstrate that defendants' acts were "sufficiently severe or pervasive to alter the conditions of [her] employment." *Pennsylvania State Police v.*

*Suders*, 542 U.S. 129, 133-34 (2004).  The Third Circuit has interpreted that standard to constitute an amalgamation of the second prong and fourth prong, which requires that the discrimination affect a reasonable person in the plaintiff's position.  *Jensen*, 435 F.3d at 451.  A hostile work environment claim may not "rely upon casual, isolated, or sporadic incidents."  *Boyer v. Johnson Matthey, Inc.*, 2005 U.S. Dist. LEXIS 171, at *58 (E.D. Pa. Jan. 7, 2005) ("Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment.") (citing *Faragher*, 524 U.S. at 788).  Instead, the "conduct must be extreme to amount to a change in the terms and conditions of employment...." *Faragher*, 524 U.S. at 788.  Moreover, the New Jersey Supreme Court "emphasize[d] that it is the harassing conduct that must be severe or pervasive, not its effect on the plaintiff or on the work environment." *Lehman*, 132 N.J. at 606 (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).

Put another way, an actionable hostile work environment requires proof that this plaintiff was subjected to a level of national origin-, ethnic-, religious-, age-, or gender-based harassment which was "severe or pervasive" enough to create a working environment which is both subjectively and objectively abusive or hostile to Egyptian, Coptic Christian, aged, or female employees. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Clark County Sch. Dist.*, 532 U.S. at 270-71 (reaffirming that conduct not severe enough to create an objectively hostile or abusive work environment is beyond Title VII's purview).

The Seventh Circuit has noted that "conduct that is either pervasive or severe may give rise to a hostile work environment," explaining that "a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944 (7th Cir. 2005).  The plaintiff need

only show that the harassing conduct was severe or pervasive, not both.  *Harvill v. Westward Commc'ns., L.L.C.*, 433 F.3d 428, 434-35 (5th Cir. 2005).

Here, beginning as early as September 2001 through her termination in August 2003, a period of nearly two years, plaintiff suggests that no week passed without Vagile making comments such as: "President Bush will get rid of the Arabs," "You will learn how to speak English," "You're here to steal our money," "Go back to your country...President Bush wants you to go back," "All of you Arabs are the same, you come here, take our money and then bomb us," and "What do you know about religion."  In addition, plaintiff claims that Vagile poked fun at the way plaintiff presented herself and her accent.  Vagile would allegedly tell plaintiff that she was "not part of the Italian team. We're all Italian here.  You're not part of it."

Plaintiff testified that Cachoeira, Vagile, and Carbone made inappropriate statements regarding her sex, telling plaintiff, "you're a woman, you're making enough money for a woman, why don't you leave it for a man, the man needs a car, the man needs the money. You have a husband that works and makes a good amount of money."  Plaintiff claims she was told to "sign over" some of her sales and clients to Carbone because he "supports a family and needs the money more than you do."

A workplace is objectively offensive when a reasonable person would find it hostile or abusive. Not every unpleasant workplace is a hostile environment.  It is often difficult to draw the line between conduct severe and/or pervasive enough to constitute a hostile work environment under Title VII or the NJLAD and conduct that is made in jest, and although coarse or offensive, is not sufficiently severe to be unlawful.  While the statements made by Vagile, Carbone, and Cachoeira do not rise to the level of severity to state a claim for a hostile work environment, the weekly

27

statements over a two year period can be found by an objectively reasonable person of plaintiff's national origin or ethnicity to be offensive.  The frequency of the these statement satisfies the pervasive element necessary to state a claim for a hostile work environment under Title VII and the NJLAD.[8]

Once the plaintiff establishes the requisite severity or pervasiveness of the hostile work environment, the plaintiff must then demonstrate that the hostile work environment should be imputed to the plaintiff's employer. *See Knave v. Boury Corp.*, 114 F.3d 407, 410 (3d Cir. 1997) ("Even if a work environment is found to be hostile, a plaintiff must also show that the conduct creating the hostile work environment should be imputed to the employer.").  Such imputation to the employer occurs where "the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Andrews*, 895 F.2d at 1486.

"An employer is liable for an employee's behavior under a negligence theory of agency 'if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a [] hostile work environment and failed to take prompt and adequate remedial action.'" *Knabe*, 114 F.3d at 411 (quoting *Andrews*, 895 F.2d at 1486).  While some of the conduct which allegedly created a hostile work environment is claimed to be from actions or statements made by Cachoeira, plaintiff's supervisor, a majority of the conduct was undertaken by plaintiff's co-workers.

---

[8]  The statements regarding gender, age, and/or religion, in and of themselves, are neither severe nor pervasive so as to give rise to a hostile work environment.  However, considering that "courts must consider the cumulative effect of the various incidents, bearing in mind that each successive episode had its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes," *Lehmann*, 132 N.J. at 607 (quoting *Burns*, 955 F.2d at 564; *Robinson*, 760 F. Supp. at 1524)), should this issue go to trial, the Court may consider permitting plaintiff to present these statements to the jury as evidence of the cumulative effect.

Therefore, the issue becomes whether the remedial action taken by defendants following plaintiff's complaint of discrimination in August 2002 was adequate. *See also Moore v. City of Phila.*, 461 F.3d 331, 349 (3d Cir. 2006) ("When coworkers are the perpetrators of the harassment, the plaintiff must prove employer liability using traditional agency principles. There is such a basis for liability where supervisors knew or should have known about the co-worker harassment, but failed to take prompt and adequate remedial action to stop the abuse."); *Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d Cir. 2001) (noting that "when the source of the alleged harassment is a co-worker, a plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action").

In this case, plaintiff has demonstrated that a material issue of fact exists as to whether the action taken was "reasonably calculated to prevent further harassment." *Knabe*, 114 F.3d at 412. Notably, a remedial measure may be reasonably calculated to prevent further harassment even if it is not effective in preventing subsequent harassment. *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006). Here, however, there is no evidence of any action taken whatsoever, notwithstanding plaintiff's complaint to Cachoeira and his supervisor in Human Resources.

### IV.  Punitive Damages

To recover punitive damages under Title VII or the NJLAD, a plaintiff must show more than the minimum conduct necessary to prove the underlying claim. *Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1135-36 (D.N.J. 1990); *Catalane v. Gillian Instrument Corp.*, 638 A.2d 1341, 1354 (N.J. Super. App. Div. 1994); *see DiGiovanni v. Pessel*, 260 A.2d 510, 511 (N.J. 1970). In particular, the plaintiff must establish that (1) upper management was an actual participant in the alleged wrongdoing or was willfully indifferent to the alleged wrongdoing, and (2) that the alleged

misconduct was especially egregious. *Rendine v. Pantzer*, 661 A.2d 1202, 1215 (N.J. 1995). To constitute especially egregious conduct, the alleged misconduct must have been "wantonly reckless or malicious" and there must be "an intentional wrongdoing in the sense of an evil-minded act or an act accompanied by a wanton and willful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1230 (N.J. 1984).

Moreover, where an employer makes a good faith effort to comply with anti-discrimination laws, such efforts serve to insulate the employer from vicarious liability for punitive damages. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 544-45 (1999); *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 110 (3d Cir. 1994); *Cavuoti v. NJ Transit Corp.*, 735 A.2d 548, 555-56 (N.J.1999).

Defendants maintain that plaintiff's claims under Title VII and the NJLAD for punitive damages are not warranted, as plaintiffs do not meet the outrageousness/egregiousness threshold set forth by both the federal courts and the New Jersey Supreme Court. However, it is not an analysis that is appropriate on summary judgment. "[T]he allowance of such damages inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent. Therefore, the infliction of such damages, and the amount thereof when inflicted, are of necessity within the discretion of the trier of fact." *Fisher v. Volz*, 496 F.2d 333, 347 (3d Cir. 1974). "The issue of punitive damages is a fact question which should be decided by a jury." *Domm v. Jersey Printing Co.*, 871 F.Supp. 732, 739 (D.N.J. 1994); *see also Weiss*, 747 F.Supp. at 1135 ("[T]he decision whether to award punitive damages is solely within the discretion of the finder of fact, and it may choose to deny punitive damages even though intentional or malicious behavior is evident.").

**_Conclusion:_**

In light of the foregoing, defendants' motion for summary judgment is granted with regard to plaintiff's discrimination and retaliation claims, but denied with respect to plaintiff's allegations of a hostile work environment and the claim for punitive damages.


_s/Peter G. Sheridan_____
PETER G. SHERIDAN, U.S.D.J.

November 16, 2007